**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF KANSAS**

| | |
|---|---|
| **MISSION GROUP KANSAS, INC.,** ) | |
| ) | |
| **Plaintiff,** ) | |
| ) | **CIVIL ACTION** |
| **v.** ) | |
| ) | **No. 06-2312-KHV** |
| **MARGARET SPELLINGS,** ) | |
| **SECRETARY OF THE UNITED STATES** ) | |
| **DEPARTMENT OF EDUCATION,** ) | |
| ) | |
| **Defendant.** ) | |
| _____ ) | |

## MEMORANDUM AND ORDER

Mission Group Kansas, Inc., doing business as Wright Business School ("WBS"), a private Kansas non-profit post-secondary educational institution, seeks review of an adverse decision by Margaret Spellings, Secretary of the United States Department of Education, on January 11, 2006. This matter is before the Court on Plaintiff's [Motion] For APA Review And Reversal Of Secretary Of Education's Adverse Decision (Doc. #32) filed December 22, 2006. For reasons set forth below, the Court overrules plaintiff's motion and affirms the Secretary's decision.

## Legal Standards

Under appeal regulations for the Federal Student Aid ("FSA") division of the Department of Education,[1] a party may seek agency review of a final program review determination by an FSA hearing official. See 34 C.F.R. § 668.118. In writing, the hearing official decides whether the final determination was supportable in whole or in part. See id. The hearing official bases findings of fact only on evidence properly presented before him, on matters given official notice and on

---

[1] During the relevant time frame (1992 to 2000), the division was known as the Student Financial Assistance Program. For ease of reference, however, the Court refers to the division as FSA.

stipulated facts.  See id.  A party may appeal to the Secretary the decision of the hearing official.

See 34 C.F.R. § 668.119(a).  In doing so, the party may submit proposed findings of fact, and such

facts must be supported by admissible evidence already in the record, matters that may be given

official notice or stipulated facts.  See 34 C.F.R. § 668.119(c).  On appeal, neither party may

introduce new evidence.  See 34 C.F.R. § 668.119(d).  The Secretary may affirm, modify, reverse

or remand the case to the hearing official.  See 34 C.F.R. § 668.120(a)(1).  If the Secretary modifies,

remands or overturns the decision, the Secretary must issue a decision which includes a statement

of reasons for doing so.  See 34 C.F.R. § 668.120(b)(1).  Unless the Secretary remands the case, the

Secretary's decision is the final decision of the agency.  See 34 C.F.R. § 668.121(a)(1).

The APA authorizes the Court to set aside and hold unlawful agency action which is

arbitrary, capricious, an abuse of discretion or otherwise not in accordance with the law.  5 U.S.C.

§ 706(2)(a).  Agency action must be upheld, if at all, on the basis articulated by the agency.  See

Cherokee Nation of Okla. v Norton, 389 F.3d 1074, 1078 (10th Cir. 2004), cert. denied, 546 U.S.

812 (2005); see also Am. Textile Mfrs. Inst., Inc. v. Donovan, 452 U.S. 490, 539 (1981) (post hoc

rationalizations of agency or parties cannot serve as sufficient predicate for agency action).  The

essential function of agency review is to analyze (1) whether the agency acted within the scope of

its authority; (2) whether the agency complied with prescribed procedures; and (3) whether the

action is otherwise arbitrary, capricious or an abuse of discretion.  Olenhouse v. Commodity Credit

Corp., 42 F.3d 1560, 1574 (10th Cir. 1994) (citations omitted).

The arbitrary and capricious standard applies to informal agency rule-making proceedings

as well as informal agency adjudications.  See id.; Sierra Club v. Davies, 955 F.2d 1188, 1192 n.10

(8th Cir. 1992).  An agency decision is arbitrary and capricious if the agency relies on factors which

Congress has not intended it to consider, entirely fails to consider an important aspect of the problem, offers an explanation for its decision which runs counter to the evidence before the agency, or is so implausible that it cannot be ascribed to a difference in view or the product of agency expertise.  Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Ins. Co., 463 U.S. 29, 43 (1983).  The Court must consider whether the agency's decision is based on the relevant factors and reveals a clear error of judgment.  Citizens to Preserve Overton Park, Inc. v. Volpe, 401 U.S. 402, 416 (1971).  Although the factual inquiry is searching and careful, the ultimate standard of review is a narrow one.  Id.  A court may not substitute its judgment for that of the agency.  Marsh v. Or. Natural Res. Council, 490 U.S. 360, 378 (1989).  It must determine whether the agency decision is within the bounds of reasoned decision making.  Baltimore Gas & Elec. Co. v. Natural Res. Defendant. Council, 462 U.S. 87, 105 (1983).  To do this, the Court must determine whether the agency has considered the relevant factors and articulated a rational connection between the facts found and the choice made.  See Bowman Transp., Inc., v. Arkansas-Best Freight Sys., Inc., 419 U.S. 281, 285-86 (1974).  In addition to requiring a reasoned basis for agency action, the arbitrary and capricious standard requires an agency action to be supported by substantial evidence.  Olenhouse, 42 F.3d at 1575.

While the APA standard of review is ordinarily a deferential one, Cherokee Nation, 389 F.3d at 1078, courts do not afford any deference to an agency interpretation which is clearly wrong, Gen. Dynamics Land Sys. Inc. v. Cline, 540 U.S. 581, 600 (2004), or where Congress has not delegated administrative authority to the agency on the particular issue, Adams Fruit Co. v. Barrett, 494 U.S. 638, 649-50 (1990).  Courts also afford considerably less deference to an agency interpretation which conflicts with an earlier interpretation by the agency.  Watt v. Alaska, 451 U.S. 259, 273

(1981).

## **Factual Background**

### I.        The Higher Education Act of 1965

Under Title IV of the Higher Education Act of 1965 ("HEA"), 20 U.S.C. § 1070 <u>et seq.</u>, eligible students who enroll in eligible programs at post-secondary institutions can receive student loans and grants.  WBS is an eligible post-secondary institution and participates in various Title IV programs: Federal Family Education Loans, Parents of Undergraduate Students and Pell Grant and Supplemental Educational Opportunity Grants.  WBS offers short-term, non-degree vocational programs, typically 42 weeks in length.  During the relevant eight-year time period (1992-2000), WBS operated campuses in Overland Park, Kansas and Oklahoma City, Oklahoma.  The student body at each campus was predominantly low-income, and most students qualified for Pell Grants and subsidized federal student loans.

In 1992, Congress re-authorized and amended HEA.  In doing so, it adopted the so-called "pro rata refund" provision.  20 U.S.C. § 1091b.  The provision applied to first-term first-year students who dropped out before completing the period for which they had received federal aid.  It allowed the institution to retain any amount which it had earned, but required it to refund to the student – or to FSA if it had provided loans or grants – a pro rata portion of the aid disbursed to the student.  <u>See</u> Administrative Record (Doc. #25) ("AR") at 1007.

In calculating pro rata refunds from 1992 to 1998, institutions had to include in the base amount all "institutional charges."  20 U.S.C. § 1091b(c)(1) (1992-98).  Institutional charges included tuition, fees, room, board and "other charges assessed the student by the institution."  <u>Id.</u>

## II.     Implementing Regulations

Although Congress adopted the pro rata refund provisions in the summer of 1992, the Secretary did not promulgate final regulations to implement them until November 1, 1994.  34 C.F.R. § 668.22 (1994-99).  The regulations repeated the statutory mandate that tuition, fees, room, board and "other charges assessed the student by the institution" be included in the base amount in calculating the pro rata refund.  Id. § 668.22(c)(1).  Regulations defined "other" institutional charges as including "charges for any equipment (including books and supplies) issued . . . to the student if the institution specifies in the enrollment agreement a separate charge for equipment that the student actually obtains."  Id. § 668.22(c)(5)(i).  The regulations, however, allowed an institution to exclude certain books and supplies from the calculation of a pro rata refund.  Id. § 668.22(c)(5)(ii).  Specifically, it allowed an institution to exclude the documented cost to the institution of unreturnable equipment or of returnable equipment if the student did not return the equipment in good condition, allowing for reasonable wear and tear, within 20 days following the date of the student's withdrawal.  Id.  To qualify for the exclusion, the institution had to "clearly and conspicuously disclose in the enrollment agreement any restrictions on the return of equipment, including equipment that [was] unreturnable . . . [and] notify the student in writing prior to enrollment that return of the specific equipment involved [would] be required within 20 days of the student's withdrawal."  Id.  The pro rata refund regulation remained unchanged from 1994 through 1999.

## III.     Agency Interpretation

From 1994 to 1999, FSA made various policy statements which purported to interpret 20 U.S.C. § 1091b and 34 C.F.R. § 668.22.  In March of 1994, FSA issued guidance entitled "R&R

[Refund & Repayment] for Financial Aid Administrators."  The publication stated that if "the books or supplies could have reasonably been purchased by the student elsewhere, and were **voluntarily** purchased at the school for the sake of convenience only, those charges may be considered noninstitutional (as though purchased through an independent 'store') and may be subtracted from the refund due to the student [or FSA if it provided the funds], even if the charge appears on the student's institutional bills."  AR at 731.  This publication also stated that students "**must be notified, in writing at the time of enrollment, that purchase of the supplies from the school [i]s not required**."  Id.

> An internal FSA memo dated July 5, 1995 stated as follows:
>
> In order to consider the charges for equipment (including books) to be non-institutional charges . . . , the school would have to demonstrate that students could reasonably purchase the items at another location unaffiliated with the school. In addition, the school would have to provide documentation that students were given written notification that purchase of these items from the school was not required.  If the school cannot provide these proofs, then these charges for equipment are institutional charges, and subject to pro-ration.

AR at 737.

A 1995 edition of the FSA "Blue Book," an official publication for auditors and managers, stated that charges other than tuition, fees, room and board "may be considered institutional charges if they are required for all students in a given program of study and if they are disclosed as such in the school's published consumer information."  AR at 306.  The FSA Blue Book provided that "[b]ooks, supplies and equipment are also considered institutional charges if the charges are specified in the student enrollment agreement or if there is no option to buy the books, supplies or

equipment from a source other than the institution."  Id.[2]

The FSA Student Financial Aid Handbook ("FSA Handbook"), issued for the 1995–96 award year, stated as follows:

> Usually, if the student purchases books or supplies from the school, it's an institutional cost.  However, the Department has determined that if the student has a *real and reasonable* opportunity to obtain the items (such as books) elsewhere and only *chooses* to buy them at the school as a matter of convenience, the cost is a noninstitutional charge.  * * *
>
> Under pro rata and federal refund policy rules, if the cost is listed in the student's enrollment agreement as a separate and required charge, or if the school refers the student to a school vendor or affiliated entity to purchase the required item, then it is considered an institutional cost.

AR at 309-10.

In January of 1999, Dr. Jeff Baker, a policy analyst at the Department of Education, issued a memorandum on the pro rata refund regulation (the "Baker Memo").  AR at 272, 311-17.  The Baker Memo stated that a "real and reasonable opportunity" for students to purchase books from other sources could only exist if the institution could demonstrate (1) that the required materials "were available for purchase at a relatively convenient location unaffiliated with the school" (the "availability requirement"), and (2) that the institution "made financial aid funds available to students in a timely manner, so that its students could exercise the option to purchase the required course materials from alternative sources" (the "economic means requirement").  AR at 316.

## IV.    Administrative Proceedings Involving WBS

Before 1992 or 1993, WBS purchased all books for each instructional program and

---

[2]    An FSA letter to another institution dated July 5, 1995 stated that "[i]f the books and supplies are not required to be purchased from the institution, the charges for those supplies are non-institutional educational costs and would not be a part of the refund calculation."  AR at 734.

incorporated the cost of the books in the tuition charge.  Beginning in 1992 or 1993, it allowed students to purchase books from the school or elsewhere.  AR at 255-56.  After the pro rata regulations became effective, in late 1994 or early 1995, John Mucci, an officer of WBS, had a number of telephone conversations with John DeCleene, an FSA employee.  Mucci asked whether WBS could continue its book sale practices under the new pro rata refund provisions, and DeCleene stated that WBS could do so and would not have to include the book charges in the refund calculations if it gave written notice that students were not required to purchase their books from WBS.  AR at 256-57, 639-41, 643-47.[3]  In administrative proceedings, DeCleene later gave a declaration which denied any recollection of this conversation.  AR at 1204-05.  Mucci's declaration, however, expressed a distinct recollection which is supported by phone records, AR at 256-57, 565-66, 643-99, and the declaration of Jim Miller (with whom Mucci had discussed the book sale advice), AR at 639-41.

Beginning in July of 1995, WBS added a supplemental statement to its school catalog, which set forth course offerings and prices.  The supplemental statement stated as follows:

> Books may be purchased from the institution *at institutional costs plus the appropriate State Sales Tax.*  Students are not required to purchase from the school, however upon beginning a course, the student must have the exact edition as that issued by the school.  Once books are distributed, no refunds will be issued.

AR at 319-20 (italicized text added between July of 1995 and May of 1999).

---

[3]     The Secretary now asserts that these facts are based on a self-serving declaration that gives rise to a credibility issue, see Defendant's Brief In Support Of Agency Action (Doc. #51) at 6, but the Secretary did not raise this issue in her final decision.  Indeed, the Secretary's final decision did not question the hearing official's factual findings, which largely adopted the version of facts set forth in the declarations of WBS employees.  AR at 1104-08.  As explained above, agency action must be upheld, if at all, on the basis that the agency articulated.  See Cherokee Nation, 389 F.3d at 1078.

During the relevant period, WBS used an enrollment agreement and a financial aid entrance interview form.  The enrollment agreement had blank line items where tuition, registration fees and book charges could be entered and a separate form for students to authorize Title IV aid to pay for books they chose to purchase from WBS.  AR at 321, 323-24.

Federal student aid is distributed to students in two "disbursements," the first one around the start of the academic term and the second one after the student reaches the midpoint.  See 34 C.F.R. § 668.164.  Most WBS students paid nearly all of their tuition with Title IV aid.  Accordingly, the first disbursement of Title IV aid was used to completely satisfy tuition.  WBS did not have "excess" funds to distribute to students at the beginning of the academic term.  WBS advanced "credit" to students who wished to purchase books from the school but did not have their own cash or credit cards. These advances were to be repaid from the second disbursement of Title IV aid.  AR at 258-60, 568-69.

WBS staff (former and current) submitted declarations to FSA which stated that (1) nearly all WBS students elected to purchase their books from WBS, but some students obtained used books from former students or new books from other sources; (2) WBS staff did not tell students that they had to buy books from WBS; (3) other sources, including a nearby community college and a nearby Barnes & Noble store, provided textbooks; and (4) WBS book charges were competitive.[4]  From 1995 until August of 2000, WBS offered books for students to purchase and did not include book sale charges in refund calculations.

In the spring of 1995, the FSA conducted a program review of how WBS was administering

---

[4]        Up until October 1, 1997, WBS sold its books at a markup to cover administrative overhead and carrying costs.  After that, WBS sold the books at cost.  AR at 257-60, 641, 1516-19, 1539-41, 1546-58.

Title IV aid including refund calculations.  The FSA report did not address the WBS practice of not including book sale charges in refund calculations. AR at 261, 325-44.  The 1995 program review, however, stated as follows:

> [A]lthough the review was thorough, it cannot be assumed to be all inclusive.  The absence of statements in the report concerning the institution's specific practices and procedures must not be construed as acceptance, approval or endorsement of those specific practices and procedures.  Furthermore, it does not relieve Wright Business School of its obligation to comply with all of the statutory and regulatory provisions governing the Title IV programs.

AR at 329.

In August of 1999, the FSA conducted another program review at WBS.  In its initial Program Review Report, issued in September 1999, FSA found that WBS book sale charges were "institutional charges" that should have been included in refund calculations. According to the report, students were compelled to buy their books from WBS and did not have any "real and reasonable opportunity" to purchase them from other sources.  AR at 261-62, 349-50.

WBS provided additional information to FSA regarding its book sales.  On August 17, 2000, FSA issued a final program review determination ("FPRD")[5] which found that WBS book sales were "institutional charges" and should have been included in refund calculations for dropped students.  AR at 272-73.  The FPRD stated as follows:

> Federal regulations require that items included on the student's enrollment agreement are institutional charges that are subject to federal refund calculations "if the institution specifies in the enrollment agreement a separate charge for equipment that the student actually obtains. . . ." 34 C.F.R. § 668.22(c)(5) (1999) (Pro Rata Refund formula); 668.22(d)(3) (Federal Refund formula).  We note that Wright Business School included charges for books and supplies as part of the student enrollment agreement, and therefore these charges were institutional costs that were

---

[5]        The FPRD is the final FSA decision before review by a hearing official and ultimately the Secretary.  Here, WBS challenges the Secretary's final decision.

subject to the regulatory refund calculations.

Furthermore, even where charges for books and supplies appear to be offered as an "option" on the enrollment agreement, an institution that routinely charges its students for those items must treat them as institutional costs unless it demonstrates that its students have a real and reasonable opportunity to students to purchase books elsewhere.  Student Financial Assistance Programs Policy Development Division Policy Bulletin, "Calculating Institutional Refunds: What Are Institutional Charges?," January 7, 1999.  The criteria for this opportunity include whether required materials are available at a relatively convenient location unaffiliated with the school and the school makes financial aid available to its students so they can purchase the books elsewhere in time to use them in class.  There is no evidence that Wright Business School ever provided student financial aid funds to its students so that they could purchase book and supplies from sources other than the school. Furthermore, Wright Business School's catalog supplements emphasized that students were required to have the specific (but not specified) edition of the textbooks by the beginning of class.  Nor is there any indication that students were ever advised that financial aid funds would be provided to them to purchase the books.  For this reason, the Department has concluded that the book charges were assessed to all students and subject to refund.

AR at 272-73.  The FPRD relied in part on the Baker Memo, which FSA prepared in January of 1999.  While the Baker Memo was posted on FSA's website at some point, Susan Barket, an FSA program reviewer, acknowledged that it was not easy to locate.  AR at 488.  WBS first became aware of the Baker Memo during the program review in August of 1999.  AR at 261-63.

The FSA's 1999 program review for WBS examined three award years, i.e. from July 1, 1996 through June 30, 1999.  In the initial Program Review Report and subsequent correspondence, AR at 349, 397, the Department asked WBS to perform a "full file" review of all refund calculations during the three-year time period.  WBS declined to do so because it believed that the Department finding was factually and legally erroneous and that the reconstruction would require an enormous amount of staff time.  AR at 370, 412-414.

Since WBS declined to review past refund calculations, FSA employed a loss formula methodology to calculate the amount which WBS should have paid if it had included book sale

charges in refund calculations during the four-year period from July 1, 1996 through June 30, 2000. It calculated that WBS had omitted $146,882 in book charges from its refund calculations.  AR at 275.[6]

In the fall of 2000, WBS timely filed an administrative appeal of the book sale finding pursuant to 20 U.S.C. § 1094 (b) and 34 C.F.R. § 668.113.  AR at 21-27.  On February 7, 2002, after oral argument, Judge Ernest C. Canellos, an FSA hearing official, set aside the agency finding against WBS.  AR at 1104-08.  In doing so, Judge Canellos noted that (1) WBS sold its books under a published return policy which did not allow refunds or book returns; (2) WBS notified its students in writing and otherwise that they could purchase books from other sources and were not required to buy them from WBS; (3) FSA presented no evidence to dispute WBS evidence that books were available to WBS students from alternate sources at competitive prices; and (4) WBS presented evidence that before the period covered by the 1999 program review, it had contacted an FSA employee who gave it advice on book sale practices and the advice was consistent with written advice by FSA during the same time period.  AR at 1105-07.

Judge Canellos observed that the standards which FSA used during the program review were "evolving" standards which FSA was retroactively applying to WBS.  AR at 1107-08.  On this basis and because WBS students never returned the books which they had purchased and the WBS book return policy was well known, Judge Canellos distinguished the WBS case from a 2000 refund decision against another institution by Secretary Richard Riley, In the Matter of Cannella Beauty Schools ("Cannella"), Docket Nos. 98-S2-SA & 98-73-SA (Dec. 12, 2000).  AR at 1207-10.

---

[6]        WBS denies that it is liable for any amount, but it does not dispute the Department's methodology in calculating this amount.

On January 11, 2006, the Secretary reversed Judge Canellos' ruling on the grounds that WBS enrollment agreements identified and assessed a separate charge for books. The Secretary refused to apply the "real and reasonable opportunity" standard, explaining her decision as follows:

> This case is controlled by 34 C.F.R. Section 668.22(c) (1995) and the prior decision of the Secretary in, In the Matter of Cannella Schools of Hair Design, Docket Nos. 98-72-SA and 98-73-SA, U.S. Dep't of Educ. (December 12, 2000) (Cannella).
>
> The regulation (34 C.F.R. Section 668.22(c)) defines a pro rata refund to include other charges assessed the student by the institution. Other charges assessed the student by the institution include charges for books issued by an institution if the institution specifies in its enrollment agreement a separate charge for these books. In Cannella, the Secretary stated that not labeling a document an enrollment agreement could not be used to circumvent the plain language of the regulation. The key factor for determining whether book charges should be included in a pro rata refund calculation is whether the institution identified and assessed a separate charge for its books.
>
> In Wright, Judge Canellos indicated that the regulatory requirement regarding whether to include book charges as institutional charges in pro rata refund calculations has been evolving. It has not. The real and reasonable opportunity standards was not meant to subvert or otherwise usurp the standard contained in [] 34 C.F.R. § 668.22(c); instead, it provides guidance in circumstances where it is not readily apparent from an enrollment agreement or other document that an institution assessed a separate charge for its books.
>
> In the instant case, WBS clearly identified and assessed a separate charge for its books in its enrollment agreements. Consequently, I find that the book charges assessed by WBS in this case constitute charges assessed the student by the institution within the meaning of the regulation and thus must be taken into account in calculating a refund.

AR at 1582-83.

## **Analysis**

This dispute involves refund calculations for the period from July 1, 1996 through June 30,

-13-

2000.[7]  WBS argues that the Secretary's decision is arbitrary and capricious because (1) it is contrary to 20 U.S.C. § 1091b in that "charges assessed the student" do not include books which students may purchase elsewhere; and (2) it did not address the factual finding by the administrative hearing official that WBS students could purchase books from other available sources.  In the alternative, WBS argues that at least as to the time period before August of 1999, the Secretary's decision is arbitrary and capricious because it relies on retroactive application of a new interpretation of a regulation.  Preliminarily, it is helpful to focus on the regulatory language of 34 C.F.R. § 668.22(c)(5)(i)-(ii), which broadly defines institutional charges but expressly authorizes an institution to exclude books and other equipment from institutional charges under certain conditions.  WBS makes no effort to qualify its charges for the exclusion.  Instead, it argues that its book sales should not be initially included in the category of institutional charges.

During the period of the program review, HEA required schools to calculate a pro rata refund amount for students who withdrew or dropped out during the first 60 per cent of the first enrollment period.  20 U.S.C. § 1091b (1992).  A pro rata refund was defined as:

> . . . not less than that portion of the tuition, fees, room, board, and other charges assessed the student . . . equal to the portion of the period of enrollment for which the student has been charged that remains on the withdrawal date, rounded downward to the nearest 10 percent of that period, less any unpaid amount of a scheduled cash payment for the period of enrollment for which the student has been charged.

20 U.S.C. § 1091b(c) (1992).  During the relevant period, institutions had to refund institutional charges from Title IV funds which FSA provided for each eligible student.  Regulations

---

[7]      When Congress re-authorized HEA in 1998, it added new provisions regarding return of Title IV aid provisions effective October 1, 2000.  These provisions replaced the pro rata refund provisions.  This case involves the four year period ending June 30, 2000 under the pro rata refund provisions.

-14-

implementing this statutory provision defined institutional charges as including

> charges for any equipment (including books and supplies) issued . . . to the student if the institution specifies in the enrollment agreement a separate charge for equipment that the student actually obtains.

34 C.F.R. § 668.22(c)(5)(i) (1994).  This regulation remained unchanged from 1994 through 1999.

As explained above, the pro rata refund provision sought to return to the withdrawing student, or to FSA if it had provided the funds, a portion of the funds which WBS had received to educate that student.  AR at 1107.  WBS was entitled to retain the amount which it earned, but it had to return the unearned portion to the student or the FSA.  Id.; see 34 C.F.R. § 668.22.  Therefore, the ultimate issue in this case is for purposes of the pro rata refund provision, what portion of the book charges WBS earned.  WBS contends that it earned all of the book charges because the charges were not "assessed" under 20 U.S.C. § 1091b.  FSA maintains that WBS assessed book charges in the student enrollment agreements and that WBS therefore earned only that part of the book charges which corresponded to the portion of the academic term which the student completed.

**I.     "Other Charges Assessed The Student" Under 20 U.S.C. § 1091b**

WBS first argues that the Secretary's decision is contrary to the plain language of 20 U.S.C. § 1091b because the Secretary did not evaluate whether WBS required students to purchase books from the institution.  By statute, the pro rata refund applies to institution charges, which are defined as tuition, fees, room, board and "other charges assessed the student" by the institution.  20 U.S.C. § 1091b(c)(1).  The refund statute does not define "other [assessed] charges," but the pro rata refund regulation states that book charges will be treated as assessed charges if "the institution specifies in the enrollment agreement a separate charge for [the item] that the student actually obtains."  34 C.F.R. § 668.22(c)(5)(i) (1994-99).  WBS does not dispute that 34 C.F.R. § 668.22(c) applies or that

-15-

the regulation is valid on its face.  Rather, WBS argues that in her final decision, the Secretary went beyond the plain meaning of the language "specifies . . . a separate charge" in the regulation and added (1) a presumption that because an enrollment agreement has a blank for book charges, the institution assesses and specifies a charge for books to all students and (2) an economic means requirement, which requires institutions to provide students the economic means to purchase books from other sources.

The Secretary found that "WBS clearly identified and assessed a separate charge for its books in its enrollment agreements."  AR at 1583.  The Secretary also held that the case was controlled by the pro rata refund regulation, 34 C.F.R. § 668.22(c), and the prior ruling in Cannella, where the Secretary found that even though the equipment acknowledgment form in that case purported to give students a choice to purchase the materials from an outside vendor, the equipment charge was an institutional cost because the institution required students to purchase equipment before classes began and assessed the students' federal aid for the equipment.  AR at 1207, 1210.[8]

WBS argues that the Secretary erroneously assumed that a blank line for book charges means that an institution has assessed and specified a charge for books.  WBS' argument has superficial appeal, but it must be rejected in light of the pro rata refund regulation which WBS does not challenge.  As explained above, the refund regulation states that book charges are included as assessed costs "if the institution specifies in its enrollment agreement a separate charge for the [items] that the student actually obtains."  34 C.F.R. § 668.22(c)(5)(i).  All WBS students who are

---

[8]    Cannella also held that "not labeling a document an enrollment agreement could not be used to circumvent the plain language of the regulation."  Id.  The Secretary found that the equipment acknowledgment form was part of the enrollment agreement within the meaning of the refund regulation.  AR at 1208.  In this regard, Cannella is immaterial to this case because the blank for book charges is on the WBS form enrollment agreement.

relevant to this issue did obtain books from WBS, and WBS clearly assessed a specific charge for books in the relevant enrollment agreements.  Admittedly, hypothetical WBS students may have chosen to purchase books elsewhere or received books from former students.  But for the WBS students whose refund calculations are in issue, WBS did assess book charges within the meaning of the statute and regulation.  See FSA Policy Interpretation, Calculating Institutional Refunds: What Are Institutional Charges? (Jan. 7, 1999), AR at 312 (cost need not be assessed all students to constitute institutional cost).  In addition, the WBS argument ignores the fact that the enrollment agreement also contains blank lines for tuition and registration fees, but these costs are clearly institutional costs under the pro rata refund statute and regulation, and WBS does not argue otherwise.[9]  See WBS Enrollment Agreement, AR at 321.  Because the book charges fall squarely within the regulation, the Secretary was not required to separately analyze whether WBS students had a real and reasonable opportunity to purchase books elsewhere.[10]  The Secretary correctly noted that the real and reasonable opportunity standard contained in agency guidance was not meant to subvert or otherwise usurp the standard in the refund regulation and instead merely provided guidance when the enrollment agreement did not clearly specify a separate charge for books.  AR at 1583.  In other words, the Secretary did not need not to analyze whether WBS actually "required" students to purchase books from the school because the book charges were specified in the

---

[9]      The Court cannot ascertain precisely when WBS completed the blank lines for book charges, but it apparently did so before presenting the enrollment agreements to prospective students.  See WBS Program Review Response dated December 3, 1999, AR at 366 (WBS published "approximate cost for books and supplies if purchased from the institution . . . on the enrollment agreement").

[10]      Likewise, because the Secretary found that the enrollment agreements identified and assessed a separate charge for books, she was not required to address whether students had the economic means to purchase books from other sources.

enrollment agreement and assessed from student federal aid.[11]  In sum, the Secretary's decision that the WBS book charges are institutional costs because they are specified in the student enrollment agreements is within the bounds of reasoned decision making.  See Baltimore Gas, 462 U.S. at 105. The Court therefore overrules plaintiff's motion to review on the basis that the Secretary's ruling is contrary to the refund statute and regulation.[12]

## II.   Retroactive Application Of Economic Means Requirement

In the alternative, WBS argues that at least as to the time period before August of 1999, the

---

[11]     See FSA Blue Book (1995 ed.), AR at 306 (books, supplies and equipment considered institutional charges (1) if charges specified in enrollment agreement *or* (2) if no option to buy books, supplies or equipment from other sources); FSA Handbook (1995-96 award year), AR at 309-10 (under pro rata and federal refund policy rules, if cost is listed in student enrollment agreement as separate and required charge, *or* if school refers student to school vendor or affiliated entity to purchase required item, then it is considered an institutional cost); Institutional Eligibility; Student Assistance General Provisions; Federal Family Educational Loan Programs, 59 Fed. Reg. 61142, 61163 (Nov. 29, 1994) (equipment charge is non-institutional charge if institution does not have separate charge for equipment *and* student has option to purchase elsewhere); Student Assistance General Provisions; Federal Family Educational Loan Programs, 59 Fed. Reg. 22348, 22356 (Apr. 29, 1994) (other charges include charges for books issued by institution to student provided that enrollment agreement signed by student specifies separate charge for such equipment *or* provided that institution refers student to affiliated vendor for purchase of equipment).

[12]     At first blush, the equities in this case appear to favor WBS.  Indeed, the hearing officer found in favor of WBS in part because he thought that FSA, standing in the place of students who had not returned books, should not be entitled to recover the book charges while the students retained possession of the books.  AR at 1108.  Under the plain language of the regulation, however, WBS could have avoided this result by not specifying a charge for books in the enrollment agreement.  In addition, even where book charges are institutional costs, the institution is allowed a credit for book charges when students do not ultimately return the books in good condition (if the institution has a proper return policy for books).  See 34 C.F.R. § 668.22(c)(5)(ii) (1994) (if students do not return books in good condition allowing for reasonable wear and tear, within 20 days after withdrawal, school may exclude from refund calculation documented costs for books and receive credit for percentage of profits on those books); see also 20 U.S.C. § 1091b(a) (1992) (school must have fair and equitable refund policy).  WBS could have avoided any loss from students who did not return books if it had adopted a return policy which complied with the pertinent statute and regulation.  Instead, WBS adopted a no return policy.

-18-

Secretary's decision is arbitrary and capricious because it relies on retroactive application of a new interpretation of a regulation.  In particular, WBS maintains that FSA did not give notice before 1999 that (1) book charges would be treated as institutional costs whenever a line item for book charges appeared in an enrollment agreement or (2) that institutions must give students the economic means to purchase books elsewhere in order to treat book charges as institutional costs.

    A.     <u>Line Item Argument</u>

    WBS maintains that before 1999, it did not have notice that book charges would be treated as institutional costs whenever a line item for book charges appeared in an enrollment agreement. It also claims that in late 1994 or early 1995, it received advice from FSA that it could continue "its then current practice of offering its students the choice of purchasing their books from WBS" and exclude book charges from the pro rata refund for students who withdrew.  AR at 256-57.  WBS, however, has not shown that before it received such advice, it explained to FSA that its student enrollment agreements specified a separate charge for books.  Both the pro rata refund regulation and prior FSA guidance advised institutions that book charges would be treated as institutional costs if they were specified in the enrollment agreement.[13]  <u>See</u> <u>supra</u> note 11.

    The regulation and guidance did not explicitly state that book charges are institutional charges whenever (1) the enrollment agreement has a blank line item for book charges which is

---

[13]    Even if the FSA was misleading, estoppel cannot prevent the application of the correct meaning of governing regulations, or remove the school's obligation to make proper refunds of federal student aid funds.  <u>See</u>, <u>e.g.</u>, <u>Office of Personnel Mgmt. v. Richmond</u>, 496 U.S. 414, 432-33 (1990) (estoppel cannot grant money remedy that Congress has not authorized; government cannot be expected to secure perfect performance from its hundreds of thousands of employees); <u>see also</u> <u>Heckler v. Cmty. Health Servs. of Crawford County, Inc.</u>, 467 U.S. 51, 63 (1984) (protection of public fisc requires those who seek public funds act with scrupulous regard to requirements of law).

-19-

completed along with other blank line items; (2) the student signs the agreement; and (3) the student actually obtains the books from the institution. Even so, such a situation appears to be within the plain meaning of the regulation. The Court concedes that FSA guidance was not a model of clarity. Indeed, isolated review of some FSA guidance may have suggested that book charges would not be treated as institutional costs if students had a real and reasonable opportunity of purchasing the books elsewhere. See FSA Handbook (1994-95 award year), AR at 1430 (if student has real and reasonable opportunity to obtain items elsewhere and only chooses to purchase school as a matter of convenience, cost is noninstitutional charge). Reading the guidance as a whole, however, along with the pro rata refund regulation, institutions were on notice that the real and reasonable opportunity test did not apply if an institution specified a separate charge for books in the enrollment agreement which students signed. See 34 C.F.R. § 668.22(c)(5)(i) and guidance in supra note 11. Accordingly, the FSA did not apply to WBS a new interpretation of 20 U.S.C. § 1091b and 34 C.F.R. § 668.22.

Even if the Secretary's decision applied a new interpretation to WBS, retroactive application of a ruling is permitted unless the agency substitutes "new law for old law that was reasonably clear." Farmers Tel. Co. v. F.C.C., 184 F.3d 1241, 1251 (10th Cir. 1999) (quoting Williams Natural Gas Co. v. FERC, 3 F.3d 1544, 1554 (D.C. Cir. 1993) (internal quotation marks omitted)). WBS, however, has not shown that its practice of listing a separate line for book charges in the enrollment agreements was exempt from the pro rata refund provision. Indeed, since 1994, the regulation and at least some agency guidance explained that books would be considered institutional charges if the charges were specified in the enrollment agreement. See 34 C.F.R. § 668.22(c)(5); FSA Blue Book (1995 ed.), AR at 306; FSA Handbook (1995-96 award year), AR at 309-10; Institutional Eligibility;

Student Assistance General Provisions; Federal Family Educational Loan Programs, 59 Fed. Reg. at 61163; Student Assistance General Provisions; Federal Family Educational Loan Programs, 59 Fed. Reg. at 22356.  Therefore, even if the Secretary's decision reflected a new application or clarification of prior law, it could be applied retroactively.  See Farmers, 184 F.3d at 1251; Williams Natural Gas, 3 F.3d at 1554; see also Farmers, 184 F.3d at 1251 (retroactive application permitted when ruling reflected new policy for new situation, but not departure from clear prior policy); Beazer E., Inc. v. U.S. EPA, 963 F.2d 603, 610 (3d Cir. 1992) (where legal consequences hinge upon interpretation of statutory requirements, and no preexisting interpretive rule construing requirements is in effect, nothing prevents agency from acting retroactively through adjudication).

B.     Economic Means Argument

As to the economic means requirement, the Secretary relied on Cannella, which held that if an institution did not routinely distribute Title IV funds so students could get their equipment elsewhere (the economic means requirement), the equipment charge would be considered an institutional charge. AR at 1210.  This part of Cannella, however, was immaterial to the Secretary's determination in this case.  As explained above, the enrollment agreements in this case identified and assessed a separate charge for books, and the Secretary did not need to address whether WBS students had the economic means to purchase books from other sources.  The economic means requirement simply was not a part of the Secretary's decision in this case, and her decision did not address whether WBS had to give students the economic means to purchase books elsewhere to avoid the pro rata refund calculation.  Therefore the Court need not reach the question whether the

Secretary could retroactively apply the economic means requirement.[14]

IT IS THEREFORE ORDERED that Plaintiff's [Motion] For APA Review And Reversal Of Secretary Of Education's Adverse Decision (Doc. #32) filed December 22, 2006 be and hereby is **OVERRULED**.  The Court affirms the final decision of the Secretary of Education on January 11, 2006 in the Matter of Wright Business School, Docket No. 00-56-SP.

Dated this 21st day of September, 2007 at Kansas City, Kansas.

s/ Kathryn H. Vratil
KATHRYN H. VRATIL
United States District Judge

---

[14]     Even if the Secretary had relied on the economic means requirement, WBS has not shown that such a requirement should not be applied retroactively.  In its program review response, WBS acknowledged that prior agency guidance introduced the real and reasonable opportunity standard but did not explain what documentation would satisfy such a standard.  See AR at 231. WBS has not shown that the economic means requirement is inconsistent with the real and reasonable opportunity standard or a "departure from a clear prior policy."  Farmers, 184 F.3d at 1251.